# 12-2786-cv

IN THE
### United States Court of Appeals
FOR THE SECOND CIRCUIT

───────────

WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, AND PUBLIC BROADCASTING SERVICE,
*Plaintiffs-Counter-Defendants-Appellants*,

v.

AEREO, INCORPORATED, F/K/A BAMBOOM LABS, INCORPORATED,
*Defendant-Counter-Claimant-Appellee,*

───────────

*On Appeal from the United States District Court
for the Southern District of New York (Nathan, J.)*

**PETITION FOR REHEARING EN BANC**

Richard L. Stone
Amy Gallegos
JENNER & BLOCK LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071-2054
(213) 239-5100

Paul M. Smith
Steven B. Fabrizio
Scott B. Wilkens
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6000

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION .................................................................................................1

STATEMENT OF THE CASE ..............................................................................5

REASONS TO GRANT REHEARING EN BANC ...............................................8

I. The *Aereo* Majority's Guideposts Conflict With The Plain Language Of The Transmit Clause. ...................................................................................8

II. *Cablevision*'s Reasoning Is Based On A False Premise. .................................12

III. *Aereo* Compounded The Problem With Its Attempt To "Reconcile" *Cablevision* With The Statute. ......................................................................13

IV. A Ruling Enjoining Aereo Need Not Overrule *Cablevision*. .........................15

CONCLUSION .....................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984) ........................................ 2, 9

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d
    Cir. 2008) ................................................................................................. 1, 10, 12

*Fox Television Stations, Inc. v. BarryDriller Content Systems*, PLC,
    No. CV 12-6921-GW JCX, ---F. Supp. 2d ---, 2012 WL 6784498
    (C.D. Cal. Dec. 27, 2012) ........................................................................ 3, 9, 11, 13

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ........................ 4

*United States v. ASCAP*, 627 F.3d 64 (2d Cir. 2010), *cert. denied*, 132
    S. Ct. 366 (2011) ............................................................................................... 4

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), *cert. denied*, No.
    12-798, --- S. Ct. ---, 2013 WL 1091891 (U.S. Mar. 18, 2013) .................... 3-4

**STATUTES**

17 U.S.C. § 101 ................................................................................................ 5, 9, 10

**LEGISLATIVE MATERIALS**

H.R. Rep. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 ...................... 6, 9

**OTHER AUTHORITIES**

Joe Flint, *Fox Could Become Cable Channel, News Corp. COO Chase
    Carey Says*, L.A. Times, Apr. 8, 2013, http://www.latimes.com/
    entertainment/envelope/cotown/la-et-ct-fox-cable-aereo-
    20130408,0,4681713.story .............................................................................. 3

Eriq Gardner, *Univision Says Aereo Could Force It To Go 'Pay-
    Only,'* Hollywood Reporter, Apr. 8, 2013,
    http://www.hollywoodreporter.com/ news/univision-says-aereo-
    could-force-434888#comments ....................................................................... 3

Jane C. Ginsburg, *Recent Developments in US Copyright Law – Part II, Caselaw: Exclusive Rights on the Ebb?* (Colum. Pub. L. & Legal Theory Working Papers, No. 08158, 2008), *available at* http://lsr.nellco.org/ columbia_pllt/08158 ......................................................... 12

2 Paul Goldstein, *Goldstein on Copyright*, § 7.7.2.2 (3d ed. 2013) ........................ 11

Jeffrey Malkan, *The Public Performance Problem In* Cartoon Network LP v. CSC Holdings, Inc., 89 Or. L. Rev 505 (2010) .......................... 11

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3] (2013) ....................................................................................... 14

Janko Roettgers, *Does Dish Want To Buy Aereo? Broadcasters Would Love To Know*, Paid Content (April 4, 2013, 7:51 p.m.), http://paidcontent.org/ 2013/04/04/does-dish-want-to-buy-aereo-broadcasters-would-love-to-know/ ........................................................................ 3

Christopher S. Stewart & William Launder, *Diller Wins A Broadcast-TV Clash*, Wall St. J., July 12, 2012, at B1, http://online.wsj.com/article/ SB10001424052702303644004577521362073162108.html ............................... 3

## INTRODUCTION

A recent split decision of this Court raises a question of exceptional importance; it effectively overturns a congressional mandate that is the foundation for much of the current system for delivery of television programming. The majority opinion in *WNET v. Aereo, Inc.*, ---F.3d---, 2013 WL 1285591 (2d Cir. Apr. 1, 2013) ("*Aereo*"), Ex. A, guts Congress's decision in 1976 to treat all services that retransmit broadcast programming to the public as being engaged in "public performances" and thus needing licenses from the copyright owners of the shows. Unless reversed, that decision will wreak commercial havoc by allowing new and existing distributors to design around this license requirement and profit from the delivery of copyrighted programming while paying nothing for it.

Aereo is a subscription retransmission service. For a monthly fee, it will send a subscriber any show being broadcast in the New York area to be viewed over an Internet-enabled device. The *Aereo* majority has now authorized Aereo to operate without any copyright license, relying on this Court's decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"). Even though *Cablevision* involved a completely different type of service – used by subscribers of a licensed cable company to record and play back programs stored on the company's

1

remote server – the *Aereo* majority felt bound by *Cablevision*'s reasoning to bless an entirely unlicensed retransmitter and cable competitor.

That ruling requires reconsideration. One of the express purposes of the Copyright Act in 1976 was to establish that *any* service engaged in retransmission of copyrighted television programming to the public is "publicly performing" the programming and therefore must pay copyright royalties. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 709-10 (1984). Even though this mandate is expressly technology-neutral – applying to "any device or process" whether "now known or later developed" – the *Aereo* majority held that a commercial retransmitter can avoid all copyright obligations simply by designing its system to make a separate copy of the programming for each subscriber during the retransmission process. *Aereo* at *8. The majority based this ruling on "four guideposts" for designing around copyright liability derived not from the Act but from this Court's decision in *Cablevision*. But as Judge Chin pointed out in dissent, these guideposts cannot be squared with the Act because they accord significance to technological features of the Aereo system that are no more than a "sham" and are expressly irrelevant under the Act. *Aereo* at *15 - *16.

The Court needs to rectify this ruling now. Otherwise, the loophole it creates will swallow the entire retransmission licensing regime. Cable and

satellite companies like Time Warner Cable and Dish Network are already threatening to partner with Aereo or use Aereo-like set-ups.[1]  Copycat companies have sprung up, such as one that recently was enjoined in California.  *See Fox Television Stations, Inc. v. BarryDriller Content Sys.*, ---F. Supp. ---, 2012 WL 6784498, at *5 (C.D. Cal. Dec. 27, 2012).  And broadcasters, faced with losing a revenue stream critical to supporting free, over-the-air television, have been forced to consider converting their broadcast networks to subscription-based cable channels.[2]

Indeed, this Court has already recognized the devastating impact of allowing unlicensed retransmission of broadcast television.  In *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), *cert. denied*, No. 12-798, --- S. Ct. ---,

---

[1] Time Warner Cable's CEO has said publicly that if Aereo is legal, his company should do the same thing to avoid paying license fees, and Dish Network is in talks with Aereo.  Christopher S. Stewart & William Launder, *Diller Wins A Broadcast-TV Clash*, Wall St. J., July 12, 2012, at B1, http://online.wsj.com/article/SB10001424052702303644004577521362073162108.html; Janko Roettgers, *Does Dish Want To Buy Aereo? Broadcasters Would Love To Know*, Paid Content (April 4, 2013, 7:51 p.m.), http://paidcontent.org/2013/04/04/does-dish-want-to-buy-aereo-broadcasters-would-love-to-know/.

[2] *See* Joe Flint, *Fox Could Become Cable Channel, News Corp. COO Chase Carey Says*, L.A. Times, Apr. 8, 2013, http://www.latimes.com/entertainment/envelope/cotown/la-et-ct-fox-cable-aereo-20130408,0,4681713.story; Eriq Gardner, *Univision Says Aereo Could Force It To Go 'Pay-Only,'* Hollywood Reporter, Apr. 8, 2013, http://www.hollywoodreporter.com/news/univision-says-aereo-could-force-434888#comments.

3

2013 WL 1091891 (U.S. Mar. 18, 2013), the Court affirmed an injunction barring a service functionally identical to Aereo. It noted that if such services were allowed to take hold, the economic impact would adversely affect the "quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules." *Id.* at 286. The Court concluded that "[c]ontinued live retransmissions of copyrighted television programming over the Internet without consent would . . . threaten to destabilize the entire industry." *Id.*

But the *Aereo* majority has now *authorized* unlicensed retransmission of broadcast television – including "live" retransmissions – as long as a service programs its computers to make a copy for each subscriber as part of the process of retransmitting to that subscriber. The majority theorized that this feature somehow creates a multitude of separate private performances (to thousands of paying subscribers). As Judge Chin noted, this decision not only defies the statute but also creates tension with *United States v. ASCAP*, 627 F.3d 64 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 366 (2011), where it was uncontested that streaming a song, "like a television or radio broadcast," is a public performance. *Id.* at 74. *Accord Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 106-07, 111-12 (2d Cir. 1998).

**STATEMENT OF THE CASE**

In what is known as the Transmit Clause, Congress in 1976 provided that "to perform . . . a work 'publicly'" means, among other things, "to transmit or otherwise communicate a performance or display of the work . . . to the public, *by means of any device or process*, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101 (emphasis added). The definition of "device or process" includes those "now known or later developed." *Id.*

The statute thus tells us two things. First, it does not matter what technology is used to retransmit the performance to the public – it can be "any device or process." 17 U.S.C. § 101. Second, it does not matter if members of the public receive the performance in separate places (*e.g.*, on televisions in their separate homes) or at different times (*e.g.*, through on-demand transmissions of the same movie or television program).

The legislative history confirms Congress's intent to cover *all* future technologies:

> The definition of 'transmit' . . . is ***broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them.*** Each and every method by which the images and sounds comprising a performance . . . are picked up and conveyed is a

5

> 'transmission,' and **if the transmission reaches the public in [any] form** the case comes within the scope of . . . section 106.

H.R. Rep. No. 94-1476, at 64 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5678 (emphasis added).

Thus, all retransmitters, such as cable and satellite services, require licenses to carry broadcast stations. Aereo does the same thing – retransmitting to subscribers for a monthly fee – without any license, claiming it does not need one because it has designed its system to conform to this Court's circumscribed analysis of the Transmit Clause in *Cablevision*. *Cablevision*, however, involved a service offered by a cable company. That service, dubbed a "remote storage DVR" or "RS-DVR," mimicked the record-and-playback functions of a set-top DVR but stored each customer's copies of programs on a centralized server and played them back from there. The *Cablevision* Court concluded that these playback transmissions were *private* performances not requiring an additional copyright license.

Aereo is entirely different. For her monthly fee, when a subscriber watches a live broadcast on Aereo, Aereo captures the broadcast signal, converts it to a digital format, starts to make a separate copy, and then immediately streams the programming over the Internet to the subscriber's device from that copy. *Aereo* at *2. Aereo acknowledged that it designed

6

its system this way and confined its operations to the Second Circuit because it believed *Cablevision* would immunize it from copyright liability.[3]

In dissent, Judge Chin rightly characterized Aereo's system as "a Rube Goldberg-like contrivance, over-engineered in an attempt to avoid the reach of the Copyright Act and to take advantage of a perceived loophole in the law." *Id.* at *15. The majority, however, blessed Aereo's effort to design around the Transmit Clause. It took the limited holding of *Cablevision* and derived "four guideposts" for designing a system to avoid copyright liability – even though, under the plain language of the Transmit Clause, the design of the system is not supposed to matter. *Id*. at *8.

Applying these guideposts, the majority held that Aereo's unique copy set-up made the transmissions it streams to its subscribers "private." *Id*. at *9. In so doing, the majority allowed an unlicensed service that functions just like a licensed retransmitter to profit from delivering copyrighted works owned by others, just because each transmission originates from a separate copy of programming on the server. The majority implicitly acknowledged that this outcome made no functional sense, stating that "[p]erhaps the

---

[3] Aereo uses individually assigned mini-antennas rather than a master antenna to capture broadcast programming. The *Aereo* majority suggested that this aspect of the system might also itself allow Aereo to evade licensure, *Aereo* at *12 – thus paving the way for another method of designing around a congressional mandate that is technology neutral.

7

application of the Transmit Clause should focus less on the technical details of a particular system and more on its functionality," but it concluded that such an approach was precluded by *Cablevision*. *Id*. at *12.

### REASONS TO GRANT REHEARING EN BANC

Whatever one thinks of the outcome in *Cablevision*, it should be clear that the outcome reached here is flatly inconsistent with the Transmit Clause and congressional intent. Congress could not have been clearer that any service that captures broadcast programs and retransmits them to subscribers must be licensed, regardless of how it is designed. The root of the problem is the *reasoning* the *Cablevision* panel used to arrive at its conclusions. That erroneous analysis has now spawned an obviously incorrect decision that threatens to cause massive disruption to the television industry, and will adversely impact the public's access to the quality and diversity of programming available through broadcast television.

**I.    The *Aereo* Majority's Guideposts Conflict With The Plain Language Of The Transmit Clause.**

When interpreting a statute, the Court must begin with the plain language, giving any undefined terms their ordinary meaning. *Aereo* at *16 (Chin, J. dissenting) (citing *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1356 (2012)). Where Congress has expressed its intent in "reasonably

8

plain terms, that language must ordinarily be regarded as conclusive." *Id.* (quoting *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993)).

Here, the very concept of establishing "guideposts" for how to deliver copyrighted programming to the public without a license is antithetical to the statute. It covers "*any* device or process" including those "now known or later developed," 17 U.S.C. § 101, because Congress wanted to ensure that *all* services retransmitting programming to the public would be licensed, *see Capital Cities*, 467 U.S. at 709-10; H.R. Rep. 94-1476, at 88-89, *reprinted in* 1976 U.S.C.C.A.N. at 5703-04 (stating that "commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material" must obtain authorization and pay "copyright royalties . . . to the creators of such programs"); *BarryDriller*, 2012 WL 6784498, at *5.

Nevertheless, the *Aereo* majority held that it was duty-bound to allow Aereo to operate license-free because its system creates individual copies and then transmits from those copies to individual subscribers. The majority wrote: "Congress may not have anticipated that later technology would make it possible to mimic the functionality of early cable TV by means of private transmissions, but that unexpected result does not change the language of the statute." *Aereo* at *12 n.16. That is wrong. Congress

9

anticipated that new retransmission technologies would develop, and intended the use of these new technologies to count as *public* performances.

The basic mistake that sent this Circuit's Transmit Clause jurisprudence off course was the *Cablevision* Court's reading of the statutory terms "transmission" and "performance" as being synonymous. 536 F.3d at 135 - 36. That error led the Court to view each transmission as a separate performance, instead of viewing all transmissions of the same performance of a work by the same transmitter collectively as a public performance. *Id*. Because the Court thought it had to view each transmission in isolation, it concluded that the use of transmissions could *only* result in a public performance if a *single* transmission could be received by *multiple* people. *Id*. The *Aereo* majority followed this reasoning to hold that even though Aereo retransmitted programming to its subscribers, there was no public performance because Aereo sent each subscriber a separate transmission (albeit of the same broadcast of the same program).

*Cablevision*'s statutory analysis was plainly wrong. Under the Transmit Clause, "transmissions" and "performances" are not the same thing. The Act states that "[t]o 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. This

10

means that the "performance" is *the thing that is communicated* and the transmission is *the means of communicating* it.  As the *BarryDriller* court emphasized, copyright law protects the performance of the work – here, the television program.  2012 WL 6784498, at *4.  Copyright law does not protect transmissions, which are not copyrighted and have no entertainment value.  *Id*. ("Very few people gather around their oscilloscopes to admire the sinusoidal waves of a television broadcast *transmission*.  People are interested in watching the *performance* of the *work*." (emphasis in original)).

Commentators agree.  *E.g.*, 2 Paul Goldstein, *Goldstein on Copyright*, § 7.7.2.2, at 7:168 (3d ed. 2013) ("The error in the Second Circuit's construction of the transmit clause was to treat 'transmissions' and 'performance' as synonymous, where the Act clearly treats them as distinct– and different–operative terms."); Jeffrey Malkan, *The Public Performance Problem In* Cartoon Network LP v. CSC Holdings, Inc., 89 Or. L. Rev 505, 536 (2010) ("[A] transmission and a performance remain, technically and legally, two distinct things.  The difference between them is that a transmission is the medium through which a performance is delivered 'to the public.'  This is why there may be more than one transmission of the same performance, that is, why members of the public may receive a public performance at 'different times.'" (footnote omitted)); Jane C. Ginsburg,

11

*Recent Developments in US Copyright Law – Part II, Caselaw: Exclusive Rights on the Ebb?* 26 (Colum. Pub. L. & Legal Theory Working Papers, No. 08158, 2008), *available at* http://lsr.nellco.org/columbia_pllt/08158 (*Cablevision* confused "performance" and "transmission.").

## II.     *Cablevision*'s Reasoning Is Based On A False Premise.

The *Cablevision* court rejected the argument that it should focus on whether the same underlying performance of a work was being transmitted to the public, as opposed to focusing on individual transmissions in isolation.  It did so because it believed the former approach would mean there could never be a private performance:  "a hapless customer who records a program in his den and later transmits the recording to a television in his bedroom would be liable for publicly performing the work simply because some other party had once transmitted the same underlying performance to the public."  536 F.3d at 136.

It is not necessary to misread the statute and focus on individual transmissions in isolation to avoid this result.  The answer is to focus on who transmits and who receives a given performance.  A subscriber who records a program in his den and watches it in his bedroom is not transmitting the program to *the public*; he is transmitting it *to himself*.  That is a private

performance. That a different entity may also have transmitted the same program publicly does not make all retransmissions public.

### III. *Aereo* Compounded The Problem With Its Attempt To "Reconcile" *Cablevision* With The Statute.

*Cablevision*'s interpretation of the Transmit Clause created another problem: it read the "different times" language out of the statute. The Transmit Clause necessarily presupposes a public performance consisting of separate transmissions because a single transmission cannot be received at different times. *Aereo* at *8 n.11. Recognizing this, the *Aereo* majority's solution was to "reconcile" *Cablevision*'s flawed interpretation of the statute with the statute's actual language by holding that individual transmissions of the same programs could be aggregated and treated as public performance, but *only* if the transmissions were generated from the same master copy. *Id*.

The *Aereo* majority's solution creates an even more tortured reading of the statute. The Transmit Clause does not say anything about master copies. Nothing in the language of the statute or the legislative history supports the majority's view that only devices that transmit programming to the public from a master copy fall within the Transmit Clause. As the district court in *BarryDriller* explained, "the concern is with the performance of the copyrighted work, *irrespective of which copy of the work the transmission is made from*. 2012 WL 6784498, at *4 (emphasis added).

13

The master copy requirement is based on a statement in the Nimmer copyright treatise in which the author editorializes that the "different times" language in the statute was probably meant to cover situations where the same copy of a work is used for multiple performances to different members of the public over time.  *Aereo* at *8 n.11.  *See* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3], at 8-192.8(3)-(4) (2013) (musing that a person who watches a rented video at home would be "publicly performing" if others rented the same copy).  Professor Nimmer acknowledges that defining public performances in this way produces absurd results.  Indeed, under that reading, if four people happen to rent the same DVD copy of *Braveheart* from Blockbuster, that would result in a public performance, but if a retransmitter like Aereo makes a separate copy for each viewer, it can retransmit the Super Bowl to thousands of subscribers and that would be deemed "private" performances.  Aereo can do this even though the plain language of the Transmit Clause provides that the device or process used to transmit the program to the public is irrelevant.

A far better reading of the Transmit Clause would aggregate all transmissions of the *same performance of a work* by the *same transmitter* to members of the public, treating them collectively as a public performance regardless of whether the source is one or many copies.  That common-sense

14

approach is consistent with the Act, produces logical results and does *not* eliminate the possibility of private performances. Under it, Aereo, ivi, and cable and satellite retransmitters all publicly perform copyrighted works and all require a license, just as Congress intended. The *Aereo* approach, however, effectively eliminates any public performance for retransmissions.

## IV. A Ruling Enjoining Aereo Need Not Overrule *Cablevision*.

The *Aereo* majority seemed to think a ruling against Aereo would also render illegal an RS-DVR service like the one in *Cablevision* and other services mentioned by *amici*. *Aereo* at *12-*13. But that confuses reasoning with outcomes. While the reasoning of *Cablevision* – now turned into guideposts for designing around copyright law – needs to be rejected, that does not mean there cannot be private performances. For example, functionally the RS-DVR and Aereo are far apart. One service allows an individual cable subscriber to designate licensed programming for copying and have it played back later just to her. The other retransmits broadcast shows, live, to thousands of subscribers. Reading the Transmit Clause to allow unlicensed RS-DVR retransmissions does not dictate a result that allows Aereo's unlicensed retransmissions of broadcast programming.

## CONCLUSION

The Court should grant rehearing en banc.

15

| | |
|---|---|
| April 15, 2013 | Respectfully Submitted, |
| | /s/ Paul M. Smith |
| Richard L. Stone | Paul M. Smith |
| Amy Gallegos | Steven B. Fabrizio |
| JENNER & BLOCK LLP | Scott B. Wilkens |
| 633 West 5th Street | Matthew E. Price |
| Suite 3600 | JENNER & BLOCK LLP |
| Los Angeles, CA 90071-2054 | 1099 New York Ave. NW |
| (213) 239-5100 | Suite 900 |
| | Washington, DC 20001 |
| | (202) 639-6000 |

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*